1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10    KHALIFAH E.D. SAIF'ULLAH.

11              Plaintiff,                   No. CIV S-98-1322 MCE GGH P

12         vs.

13    EDWARD PADAOAN, et al.,

14              Defendants.          <u>FINDINGS AND RECOMMENDATIONS</u>

15    _____/

16    <u>Introduction</u>

17              Plaintiff, a state prisoner proceeding pro se seeks relief, pursuant to 42 U.S.C.

18    §1983.  Pending before the court is defendants' motion to dismiss, pursuant to non-enumerated

19    Fed. R. Civ. 12(b), and for summary judgment, pursuant to Fed. R. Civ. P. 56, filed on October

20    12, 2006, to which plaintiff filed his opposition on December 1, 2006.[1]  This matter was stayed

21    pending resolution of the <u>Mayweathers</u> class action lawsuit from November 9, 1999, until

22    September 9, 2004.  <u>See</u> <u>Orders</u>, filed on 11/9/99 and on 9/9/04.

23              Plaintiff in this action alleges that defendants have interfered with his right to

24    practice his Muslim religion.  As relief, plaintiff sought money damages and a preliminary

25    _____

26         [1] Plaintiff was granted an extension of time to respond to the motion.  <u>See</u> <u>Order</u>, filed on
      11/20/06.

                                              1

1 injunction preventing defendants from assigning him to a job which restricts him from attending

2 Friday Jumu'ah prayer service.  Plaintiff is incarcerated at California State Prison-Solano (CSP-

3 Solano).

4     In Mayweathers v. Terhune, CIV S-96-1582 LKK JFM P, restrictions on Muslim

5 inmate religious practices at CSP-Solano were challenged in a class action seeking injunctive

6 relief, whose members included all Muslim inmates at CSP-Solano.  Plaintiffs' motion for

7 summary judgment and permanent injunction was granted on June 25, 2004.  Judgment in

8 Mayweathers was entered on August 18, 2004, in accordance with the orders in that case, filed

9 on June 25, 2004, and August 18, 2004.  An amended joint order re: expungement of disciplinary

10 records of the plaintiff class was filed on September 17, 2004.

11     Plaintiff in the instant action was a Mayweathers class member and his claim for

12 money damages was preserved by the stay.  See Findings and Recommendations, filed on 9/8/99,

13 adopted by Order, filed on 11/9/99; see also, Order, filed on 9/9/04.  In the order lifting the stay,

14 filed on September 9, 2004, the undersigned noted that defendants' motion to dismiss for failure

15 to exhaust administrative remedies, filed on April 12, 1999, had been vacated at the time the stay

16 was imposed, and granted defendants leave to re-notice the vacated motion, to file a new

17 dismissal motion or to file an answer.  Defendants' amended motion to dismiss for failure to

18 exhaust administrative remedies was denied by Order, filed on September 7, 2005, adopting

19 Findings and Recommendations, filed on July 1, 2005, after which defendants' answer was filed

20 on October 7, 2005 (per the 9/7/05, Order).  A Scheduling Order was filed on March 8, 2006; the

21 pretrial conference and trial dates were subsequently vacated by Order, filed on December 4,

22 2006, pending adjudication of the instant dispositive motion.

23 Complaint

24     This matter proceeds on the original complaint, filed on July 9, 1998.  Five

25 individuals are named as defendants: Edward Padaoan and P.T. Riggins, both employed as

26 clothing distribution supervisors at California State Prison-Solano (CSP-Sol); CSP-Sol

2

Correctional Officer (C/O)  M. Montano;[2] Imam Abdul Karim Hasan, employed as a member of the State Advisory Committee of Institutional Religion for the California Department of Corrections;[3] Earle Shah, employed by the CDCR as a member of the Chaplains Coordinating Committee.  Form Complaint (Cmp.), pp. 2, 4-5, Exhibit (Ex.) K., p. 2.

Defendant Padaoan was plaintiff's immediate supervisor and defendant P.T. Riggins was Padaoan's immediate supervisor in the Facility Three clothing distribution area, where plaintiff commenced employment around August of 1997; plaintiff worked directly for defendant Riggins.  On plaintiff's first day of work, he informed defendant Padaoan that he was a Muslim, whose religion obliged him to attend the Friday Jumu'ah prayer service every week, from 12:00 p.m. until 1:30 p.m., and during daylight savings, from 1:00 p.m. until 2:30 p.m. From October 23, 1998, until April 3, 1998, plaintiff worked as a clerk for defendant Padaoan and was allowed to attend the weekly Friday prayer service.  Form Cmp., p. 3; Cmp. Attachment (Att.), p. 1, Ex. A.

On or about April 1, 1998, defendant Padaoan authorized plaintiff to attend a special Muslim service from 12:00 p.m until 3:30 p.m.  However, on that day, defendant Padaoan came to the inter-faith chapel and told plaintiff to leave the service and return to work, after which plaintiff returned to work at 2:45 p.m., whereupon he was informed by defendant Padaoan that defendant Riggins did not like plaintiff's attending the special service and that plaintiff was to discontinue attendance at the weekly Jumu'ah Friday prayer service as well.  Plaintiff reminded defendant Padaoan of the agreement plaintiff had made, when he was first assigned to work there, with defendants Padaoan and Riggins, that as long as plaintiff was able to complete his work he would be permitted to attend his mandatory religious service and informed him that

[2] Plaintiff variously spells this defendant's name as Montanna and Motanna; the court will use the spelling set forth by defendants in the pending motion.

[3] Hereafter, the court will refer to the California Department of Corrections by its current name, California Department of Corrections and Rehabilitation (CDCR).

1  arbitrary rescission of the agreement by Riggins would require plaintiff to find other work.  Att.

2  Cmp., pp. 1-2.

3            On April 3, 1998, plaintiff served 602 administrative appeals on defendants

4  Padaoan and Riggins, concerning their arbitrary actions in depriving him of attendance at the

5  weekly prayer service, which his religion obliged him to attend.  A review of plaintiff's Ex. B

6  reveals that plaintiff apparently presented no less than five grievances, all dated April 3, 1998.

7  He includes four of the grievances, wherein one is a complaint against the actions of defendants

8  Padaoan and Riggins in refusing to allow him to continue attending his religious services,

9  contending that his First Amendment rights were thereby violated.  The other grievances are also

10  directed at Padaoan and Riggins, alleging offensive conduct and unprofessional behavior by

11  each, unrelated to plaintiff's being prevented to attend Jumu'ah services.  Plaintiff avers that

12  neither of these defendants would sign the grievances at the informal level (apparently at

13  defendant Riggins' direction) and that plaintiff was directed to leave his job.  The rejection notice

14  of the grievances by the Appeals Coordinator informed plaintiff, among other things, that he

15  could submit only one grievance every seven days and that to submit five appeals dated the same

16  day was an abuse of the appeal system.  Att. Cmp., p. 2, Ex. B.

17            When plaintiff returned to work on April 6, 1998, defendant Riggins told plaintiff

18  he could not bring his Qur'an or other religious documents to work anymore and had to wear

19  state-issued clothing; plaintiff complied and returned to work.  Upon his return that day, plaintiff

20  was informed by defendant Padaoan that due to his having filed grievances against Padaoan and

21  Riggins, he would not be working as a clerk any longer.  Att. Cmp., p. 2.

22            On or about April 7, 1998, plaintiff received a 128-A custodial counseling chrono[4]

23  from defendant Riggins, as a result of the April 3, 1998, grievances, which contained fabricated

24  statements made in retaliation.  Also on April 7, 1998, plaintiff received a Rules Violation

25  ─────────────────

26            [4] The documents plaintiff submits indicates that the name under which plaintiff is
committed to prison is "Jackson."

1  Report (RVR), authored by defendant Padaoan, contending falsely that plaintiff had failed to

2  report to work after a special religious celebration for which plaintiff had been approved via

3  priority ducat for that day, with Padaoan's acquiescence.[5]  The disciplinary infraction was also a

4  retaliatory measure arising from plaintiff's grievances, and plaintiff was found not guilty at the

5  April 13, 1998, hearing, and the case dismissed, because plaintiff produced evidence which led to

6  a finding that the charge was not substantiated.   Att. Cmp., pp. 2-3, Exs. C, D, E.

7          On April 9, 1998, plaintiff presented defendants Padaoan and Riggins each with a

8  602 appeal, contending that he was being subjected to retaliatory and discriminatory actions on

9  their part, endangering his life, as a result of filing grievances against them.  Thereafter, on April

10  17, 1998, defendant Padaoan wrote another RVR, complaining falsely about plaintiff's work

11  performance, of which charges plaintiff was again found not guilty, due a lack of substantiating

12  evidence, at a May 2, 1998, hearing.   Att. Cmp., p. 3, Exs. F, G, H, I.

13          Defendant Montano would not permit plaintiff and other Muslims to congregate

14  for a dawn prayer to be performed between 4:00 a.m. and 4:45 a.m., despite an authorizing

15  memorandum plaintiff presented to him.  Defendant Montano stated that he did not care whether

16  plaintiff's practice of religion was thereby being infringed, asserting that no congregational

17  prayer would take place on the dayroom floor before 5:30 a.m.  Att. Cmp., pp. 4, 8, Ex. J.

18          Since 1979, the CDCR has engaged the services of the American Muslim

19  Commission (now American Muslim Community) to provide direction in accordance with the

20  Muslim holy text, the Qur'an, with regard to the religious rights of incarcerated Muslims.  Both

21  defendants Imam Hasan, employed by the CDCR as a member of the State Advisory Committee

22  of Institutional Religion and Earle Shah, employed by the CDCR as a member of the Chaplains

23  Coordinating Committee, have provided CDCR with information contrary to the direction

24  provided by the American Muslim Community, information that directly violates the tenets and

25

26          [5] Plaintiff was apparently removed from his clerk position on April 6, 1998, but still
worked in clothing distribution in another capacity thereafter.  See Att. Cmp., Ex. H.

1  teachings of the Qur'an and the religious rights of Muslim prisoners.  Att. Cmp., pp. 4-5, 9-46.

2  Most particularly, plaintiff faults defendants Hasan and Shah for representing that attendance at

3  Friday Jumu'ah services is not required for practicing Muslims who are incarcerated.  Att. Cmp.,

4  p. 5, Ex. K.  Plaintiff, with lengthy references to various Islamic texts and scholars, maintains

5  that these defendants Hasan and Shah misrepresented the Qur'an and tenets of Islam, and should

6  have consulted genuine Islamic scholars before opining to the CDCR as to acceptable Muslim

7  practices for those who are incarcerated, the result of their allegedly defective advice to CDCR

8  being the deprivation of the First Amendment right of plaintiffs and other Muslims to practice

9  their religion.

10        The gravamen of plaintiff's complaint is that all defendants have violated his First

11  Amendment rights, as applied to the states by way of the Fourteenth Amendment, to the free

12  exercise of religion.  Att. Cmp., pp. 6-9, 43-47.  He also appears to be framing another claim of a

13  violation of the First Amendment in the form of retaliation for filing grievances by defendants

14  Padaoan and Riggins.

15  <u>Motion to Dismiss</u>

16        Defendants first move to dismiss the case for failure to exhaust administrative

17  remedies, pursuant to non-enumerated Rule 12(b).  They seek to re-visit this previously

18  adjudicated issue on the basis that subsequent to this court's denial of defendants' motion to

19  dismiss for lack of exhaustion, the United States Supreme Court reversed the Ninth Circuit's

20  decision in <u>Ngo v. Woodford</u>, 403 F.3d 620 (9th Cir. 2005), wherein the Ninth Circuit had found

21  that an administrative appeal deemed time-barred by the prison appeals coordinator, with no

22  further appeal left within the prison grievance process, rendered an inmate's claims

23  administratively exhausted for PLRA purposes.  While it is true that the High Court has now held

24  that proper exhaustion of administrative remedies requires that the prisoner complete the

25  administrative review process in accordance with the applicable procedural rules, <u>see</u>, <u>Woodford</u>

26  <u>v. Ngo</u>, 548 U.S. ___, 126 S. Ct. 2378 (June 22, 2006), and the undersigned did reference the

1  now-reversed Ninth Circuit decision, this court did not rely primarily on that case in

2  recommending denial of the earlier motion:

3          This case, in its unstayed posture following resolution of the class
           action, proceeds now against defendants only as to money
4          damages, injunctive relief having been granted in Mayweathers v.
           Terhune, 328 F. Supp.2d 1086 (2004). The prison (including, of
5          course, defendants herein) are permanently enjoined, inter alia, not
           to impose "any form of discipline on the plaintiffs... based on
6          plaintiffs' attendance at Jumu'ah services," 328 F. Supp.2d
           at 1102.  Therefore, no prospective administrative remedy exists
7          because the court has already ordered the remedy.  The prison
           officials must comply with this order, and may not issue
8          different orders.  It follows that no form of relief, on the face of it,
           is available to him via the prison administrative appeal process
9          because, of course, the grievance procedure at issue does
           not permit any form of monetary relief.  Thus, in this unique
10         circumstance, no administrative remedy whatsoever remains
           "available" to plaintiff within the meaning of 42 U.S.C. §
11         1997e(a).  Although Booth requires exhaustion of administrative
           remedies prior to an inmate's filing a federal civil rights action
12         even when only money damages are sought, the fundamental, as
           well as the only logical, premise of the requirement is that some
13         form of administrative relief, even though not in the form of
           money, is available through that process.

14
           The meaning of the phrase "administrative remedies
15         ...available" is the crux of the case, and up to a point
           the parties approach it with agreement. Neither of
16         them denies that some redress for a wrong is
           presupposed by the statute's requirement of an
17         "available" remed[y]"; neither argues that
           exhaustion is required where the relevant
18         administrative procedure lacks authority to provide
           any relief or to take any action whatsoever in
19         response to a complaint.

20         Booth, 532 U.S. at 736, 121 S. Ct. at 1822.

21         Since this case presents that rare instance "where the relevant
           administrative procedure" lacks any authority whatever "to provide
22         any relief or to take any action whatsoever" in response to a
           grievance, this court will not require plaintiff to engage in a
23         pointless, inefficient round of grievances by recommending
           dismissal for failure to exhaust wholly non-existent administrative
24         remedies.

25  \\\\\

26  \\\\\

                                    7

1    Findings and Recommendations, filed on 7/1/05, p. 4, adopted by <u>Order</u>, filed on 9/7/05.[6]

2       This court will not re-adjudicate the exhaustion issue. Once a decision of law is

3    made, it becomes the "law of the case," and absent clear error or changed circumstances should

4    not be changed. <u>See</u> <u>United States v. Estrada-Lucas</u>, 651 F.2d 1261, 1263-64 (9th Cir.1980).

5    The law of the case doctrine provides that "a court is generally precluded from reconsidering an

6    issue that has already been decided by the same court, or a higher court in the identical case."

7    <u>United States v. Cuddy</u>, 147 F.3d 1111, 1114 (9th Cir. 1998), <u>quoting</u> <u>United States v.</u>

8    <u>Alexander</u>, 106 F.3d 874, 876 (9th Cir. 1997) (internal quotation and citation omitted).

9         Application of the doctrine is discretionary. <u>United States v. Mills</u>,
     810 F.2d 907, 909 (9th Cir.), cert. denied,484 U.S. 832, 108 S.Ct.

10        107, 98 L.Ed.2d 67 (1987). Accordingly, we review a trial judge's
     decision to depart from the principle of finality for an abuse of

11        discretion. <u>Pyramid Lake Tribe v. Hodel</u>, 882 F.2d 364, 369 n. 5
     (9th Cir.1989). A court properly exercises its discretion to

12        reconsider an issue previously decided in only three instances: (1)
     the first decision was clearly erroneous and would result in

13        manifest injustice; (2) an intervening change in the law has
     occurred; or (3) the evidence on remand was substantially

14        different. <u>Eichman [v. Fotomat Corp.</u>, 880 F.2d [149] at 157
     [1989].

15

16   <u>Milgard Tempering, Inc. v. Selas Corp. of America</u>, 902 F.2d 703, 715 (9th Cir. 1990).

17      To the extent that any basis for reconsideration could apply in this case, i.e., it is

18   that there has been an intervening change in the law; however, the change referenced does not in

19   any significant way undermine the basis for the court's prior ruling. The district judge has

20   previously determined that defendants have not met their burden to demonstrate a failure to

21   exhaust available administrative remedies. While application of the law of the case doctrine is

22   discretionary, <u>United States v. Mills</u>, 810 F.2d 907, 909 (9th Cir.1987); <u>City of Los Angeles,</u>

23   <u>Harbor Div. v. Santa Monica Baykeeper</u>, 254 F.3d 882, 888 (9th Cir. 2001), any such discretion

24

25      [6] The reference to <u>Ngo v. Woodford</u>, <u>supra</u>, was made on page 5 of the 7/1/05 <u>Findings</u>
<u>and Recommendations</u>, and did not constitute the primary basis for the undersigned's

26   recommendation.

1   properly rests in the hands of the district judge.  Therefore, the undersigned will recommend

2   denial of defendants' motion to dismiss.

3   Motion for Summary Judgment

4            Defendants move for summary judgment on the grounds that 1) defendant

5   Montano did not violate plaintiff's right to the free exercise of religion or his right to equal

6   protection; 2) defendants Padaoan and Riggins did not violate plaintiff's First Amendment right

7   to practice religion; 3) defendants Padaoan and Riggins did not retaliate against plaintiff; 4)

8   defendants Hasan and Shah did not violate plaintiff's right to practice religion; 5) defendants are

9   entitled to qualified immunity.  Motion for Summary Judgment (MSJ), pp. 8-24.

10           *Legal Standard for Summary Judgment*

11           Summary judgment is appropriate when it is demonstrated that the standard set

12   forth in Fed. R. Civ. P. 56(c) is met.  "The judgment sought shall be rendered forthwith if . . .

13   there is no genuine issue as to any material fact, and . . .  the moving party is entitled to judgment

14   as a matter of law."  Fed. R. Civ. P. 56(c).

15           Under summary judgment practice, the moving party

16           always bears the initial responsibility of informing the district court
         of the basis for its motion, and identifying those portions of "the
17           pleadings, depositions, answers to interrogatories, and admissions
         on file, together with the affidavits, if any," which it believes
18           demonstrate the absence of a genuine issue of material fact.

19   Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct., 2548, 2553 (1986).  "[W]here the

20   nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

21   judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

22   to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

23   after adequate time for discovery and upon motion, against a party who fails to make a showing

24   sufficient to establish the existence of an element essential to that party's case, and on which that

25   party will bear the burden of proof at trial.  See id. at 322, 106 S. Ct. at 2552.  "[A] complete

26   failure of proof concerning an essential element of the nonmoving party's case necessarily

9

1 renders all other facts immaterial." Id.  In such a circumstance, summary judgment should be

2 granted, "so long as whatever is before the district court demonstrates that the standard for entry

3 of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323, 106 S. Ct. at 2553.

4 　　　　If the moving party meets its initial responsibility, the burden then shifts to the

5 opposing party to establish that a genuine issue as to any material fact actually does exist.

6 Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356

7 (1986). If the moving party meets its initial responsibility, the burden then shifts to the opposing

8 party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita

9 Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986).  In

10 attempting to establish the existence of this factual dispute, the opposing party may not rely upon

11 the allegations or denials of its pleadings but is required to tender evidence of specific facts in the

12 form of affidavits, and/or admissible discovery material, in support of its contention that the

13 dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11, 106 S. Ct. at 1356 n.

14 11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that

15 might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby,

16 Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec.

17 Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the

18 evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool

19 v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

20 　　　　In the endeavor to establish the existence of a factual dispute, the opposing party

21 need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

22 claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

23 versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

24 judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

25 genuine need for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P.

26 56(e) advisory committee's note on 1963 amendments).

1    In resolving the summary judgment motion, the court examines the pleadings,

2    depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

3    any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson,

4    477 U.S. at 255, 106 S. Ct. at 2513. All reasonable inferences that may be drawn from the facts

5    placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S.

6    at 587, 106 S. Ct. at 1356. Nevertheless, inferences are not drawn out of the air, and it is the

7    opposing party's obligation to produce a factual predicate from which the inference may be

8    drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

9    aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing

10   party "must do more than simply show that there is some metaphysical doubt as to the material

11   facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the

12   nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587, 106 S.Ct.

13   1356 (citation omitted).

14          On February 9, 1999, the court advised plaintiff of the requirements for opposing

15   a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154

16   F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999), and Klingele v.

17   Eikenberry, 849 F.2d 409 (9th Cir. 1988).

18          *Defendants Padaoan & Riggins*

19          Immediately following, the court sets forth as undisputed those of defendants'

20   undisputed facts that are, in fact, materially undisputed.

21          *Undisputed Facts*

22          1. During the relevant times in this case, Defendant Padaoan was
             employed as a Material and Stores Supervisor I, at California State

23           Prison, Solano, (CSP-Solano), in Vacaville, California. He was a
             supervisor at the clothing distribution facility at complex A

24           between November 1995 and September 2000. (Ex. D, Padaoan
             Decl., ¶ 1.)

25
             2. Padaoan's job duties include supervising inmates assigned to

26           work in the clothing distribution at the A complex at CSP-Solano.

                                            11

He ensures inmates are properly performing their assigned duties, documents inmates' work performance, monitors the equipment in complex A, maintains a secure and orderly workplace, and keeps track of inmates' attendance records. (Ex. D ¶ 2.)

3. Defendant Riggins was employed as a Material and Stores Supervisor II, at CSP-Sol until 2004. (Ex. C, Riggins Decl., ¶ 1.)

4. Riggins' job duties included supervising inmates assigned to work in the clothing distribution at the A complex at CSP-Solano, ensuring inmates were properly performing their assigned duties, documenting inmates' work performance, monitoring the equipment in complex A, maintaining a secure and orderly workplace, keeping track of inmates' attendance records, and to supervise the work of the direct supervisors. (Ex. C ¶ 2.)

5. On September 6, 1997, inmate Khalifah Saif'ullah, was assigned to a job assignment in the A complex clothing distribution. (Ex. D ¶ 2; Ex. C ¶ 3.)

6. Defendants Padaoan and Riggins were Saif'ullah's supervisors from September 6, 1997, to April 21, 1998. (Ex. C ¶¶ 2, 3; Ex. D ¶ 3.)

8. Defendant Riggins explained to Inmate Saif'ullah that if he wished to attend religious functions beyond the scope of this agreement, he would need a priority ducat.  (Ex. C ¶ 5.)

9. A priority ducat is a pre-approved pass issued to inmates permitting them to go to a location within the prison. The ducat is a small piece of white paper listing the inmate's name, the location the inmate is to attend, the time the inmate is to go to the location, and the time the inmate is to return from the location. (Ex. C ¶ 5.)

10. Inmates who have a priority ducat to attend a function during work hours may go to the function without loss of credit for time worked. The inmates who are issued a priority ducat are recorded on a Master Ducat Sheet, which lists all inmates who received a ducat for a given date. (Ex. C ¶ 5.)

11. Inmate Saif'ullah was permitted to perform his religious ritual in the clothing distribution area at various times during the day. (Ex. C ¶ 6.)

12. Padaoan was aware that Inmate Saif'ullah occasionally went to the chapel for Jumah services on Fridays during his normal work hours, but he did not object to this, or dock him credit for work for this time, because he had completed all his assigned work. (Ex. D ¶ 5.)

\\\\\

13. Between September 6, 1997, and April 1, 1998, the clothing distribution complex experienced no significant disruptions from inmate Saif'ullah's religious practices. (Ex. D ¶ 6.)

15. Inmate Saif'ullah did not return to work on April 1, 1998, until approximately 2:45 p.m. (Ex. D ¶ 8.)

19. Inmate Saif'ullah did not report back to his work assignment at all on April 7, 1998. (Ex. D ¶ 12.)

20. On April 3, 1998, Inmate Saif'ullah arrived at the distribution complex at approximately 8:00 a.m. and immediately presented to Defendant Riggins five form CDC 602's containing complaints against Riggins and Padaoan. The complaints alleged that Padaoan and Riggins were performing job duties unprofessionally (i.e. "sleeping on the job," bringing in food to distribute to the inmates, playing video games," sexually harassing inmates), and refusing to permit him to attend Friday religious services. (Ex. C ¶ 8.)

21. After Riggins quickly scanned the complaints, he perceived that the allegations listed were untrue. Therefore, he informed inmate Saif'ullah that providing false information on a CDC form 602 is against institutional regulations. He also informed inmate Saif'ullah that a CDC form 602, which alleged staff misconduct must be filed directly with the Appeals Coordinator, and should not be presented to the individual staff member for response. (Ex. C ¶ 9.)

22. Inmate Saif'ullah raised his voice at this point and asked if Defendants were refusing to respond to the Form 602s. He yelled, "Are you refusing to sign them?" (Ex. C ¶ 10.)

23. Defendant Riggins responded to Inmate Saif'ullah in a calm, normal tone of voice, and again attempted to explain that because of the nature of his claim the proper procedure is for him to present the forms to the Appeals Coordinator. (Ex. C ¶ 11.)

26. On April 9, 1998, inmate Saif'ullah presented two CDC Forms 602 to Riggins and Padaoan, claiming that they had attempted to have him "assassinated" and that they were endangering his life at the clothing distribution complex. (Ex. C ¶ 14; Ex. D ¶ 13.)

27. Riggins again explained to Inmate Saif'ullah that he was required to file these documents with the Appeals Coordinator. (Ex. C ¶ 15.)

31. On April 22, 1998, inmate Saif'ullah was unassigned from the clothing distribution complex work assignment. (Ex. D ¶ 17; Ex. C ¶ 17.)

\\\\\

1  32. After April 22, 1998, Defendant Padaoan and Riggins no
   longer had any supervisory authority over inmate Saif'ullah, and
2  were not responsible for his attendance. After April 22, 1998, they
   had no authority to prevent inmate Saif'ullah from attending
3  religious services on Fridays. (Ex. C ¶ 18; Ex. D ¶ 18.)

4  44. At no period of time prior to April 1, 1998, did Defendant
   Padaoan or Riggins prevent Saif'ullah from attending Friday
5  Jumah services. (Ex. G, Pl.'s Dep. 18: 9-21, June 20, 2006.)

6  45. The CSP-Solano Warden issued memoranda in response to the
   Mayweathers lawsuit, directing supervisors to release inmates for
7  Friday Jumah services during work hours without imposing
   discipline or credit loss. (Ex. F, Memoranda dated July 16, 2001,
8  and February 24, 2003.)

9       *Disputed Facts*

10      As to each "undisputed fact" set forth by defendants Padaoan and Riggins, which

11 plaintiff does, in fact, dispute, either in part or wholly, the court first sets forth the "fact" as

12 expressed by defendants, and then plaintiff's objection thereto.

13  7. When inmate Saif'ullah began working at the clothing
    distribution complex in September 1997, he explained [to]
14  Defendant Padaoan that he is Muslim, and asked if he could do his
    prayer ritual inside the clothing distribution area during his half
15  hour lunch break. Padaoan brought this request to the attention of
    Defendant Riggins, who agreed that Inmate Saif'ullah
16  could use the clothing distribution area to perform his religious
    ritual during the day using his half hour lunch break, and break
17  times, as long he completed his assigned work. (Ex. D ¶ 4; Ex.
    C ¶ 4.)

18

19      Plaintiff contends that it is simply untrue that the agreement among himself and

20 defendants Padaoan and Riggins was that plaintiff was to conduct his prayer ritual inside the

21 clothing distribution complex.  Opposition (Opp.), p. 15.  Rather, it was agreed that plaintiff

22 would be permitted to attend Jumu'ah service so long as he completed his work.  Id.  Plaintiff

23 makes the cogent point that defendant Padaoan appears to contradict himself, or at least

24 undermine his version of the agreement in his own undisputed fact no. 12, where Padaoan admits

25 to his awareness that plaintiff occasionally attended Jumu'ah services on Fridays at chapel during

26 his normal work hours, but Padaoan did not object to this or dock him worktime credit because

14

he had completed all his assigned work.  Id., and see defendant's Ex. D, Padaoan Dec., ¶ 5.  The court observes also that apparently defendants did not take issue with any Friday chapel attendance by plaintiff for a seven-month period, and, in fact, specifically assert in undisputed fact no. 13, that from September 6, 1997, until April 1, 1998, the clothing distribution complex experienced no significant disruptions from plaintiff's religious practices. MSJ, Ex. D, Padaoan Dec., ¶ 6.  Although plaintiff did not submit a separate declaration, he signed his opposition expressly under penalty of perjury, and states therein that he attended Jumu'ah service on every Friday between 9/6/97 and 4/1/98.  He also appended as Ex. H, copies of what appear to be weekly sign-in sheets for Jumu'ah service over that period of time.  While these documents are not properly authenticated, defendants did not take their opportunity to object to them on the basis of a lack of authenticity.  The fact that plaintiff attended Friday Jumu'ah services for such an extended period without any negative repercussion at work or docked worktime credit suggests some sort of understanding beyond what has been expressly acknowledged by defendants.

14. On Wednesday, April 1, 1998, at approximately 12:30 p.m., inmate Saif'ullah requested permission from Defendant Padaoan to leave his work assignment to see the Facility Three Sergeant, Sergeant Krog. Padaoan permitted inmate Saif'ullah to leave work for this purpose. When inmate Saif'ullah did not return to work by 2:00 p.m., Padaoan searched for him, and found him in the chapel area, approximately 20 yards from the clothing distribution complex, attending a religious function. He directed inmate Saif'ullah to return to his work assignment. (Ex. D ¶ 7.)

16. When Inmate Saif'ullah returned to his work assignment, Padaoan informed him that he had left work under false pre[t]en[s]es, without proper authorization, and informed him that he would not receive credit for working the full day. (Ex. D ¶ 9.)

17. On April 1, 1998, when inmate Saif'ullah returned to work, Padaoan informed him that if he continued to leave work without authorization he would receive written disciplinary action. (Ex. D ¶ 10.)

Plaintiff states that it was defendant Padaoan who authorized plaintiff to attend a non-mandatory Muslim religious teaching with an outside guest, Imam Lukman, on April 1,

1998, a Wednesday, from 12 noon until 3:30 p.m.  Opp., pp. 15-16.  When Padaoan came to the

inter-faith chapel at 2:45 p.m. and asked plaintiff to return to work, plaintiff did so.  Id.  Plaintiff

contends that, if, in fact, he had left work under false pretenses as defendant Padaoan maintains,

or if he had sought to see Sergeant Krog, but had instead slipped off to the service, such that

Padaoan had to search for him, defendants would have written him up in a counseling chrono or

a Rules Violation Report (RVR), and would at this point have submitted a declaration from Sgt.

Krog to substantiate Padaoan's version of events, none of which was done.  Opp., pp. 16-17.

> 18. On April 7, 1998, inmate Saif'ullah presented Padaoan with a
> priority ducat to attend religious services at the chapel at 8:00 a.m.
> The ducat stated that the services were to end at 9:30 a.m. Inmate
> Saif'ullah did not present Padaoan with a ducat permitting him to
> attend any additional religious functions after 9:30 a.m. (Ex. D ¶
> 11.)

Plaintiff states that on April 7, 1998, he presented a priority ducat along with a

memorandum from the warden indicating that that day was a religious holiday, not a religious

hour.  Opp., p. 17, Ex. F.  Plaintiff's Ex. F is a copy of a 4/7/98 RVR, with a hearing held on

4/13/98, finding plaintiff not guilty of failure to report to work on 4/7/98, and stating that

plaintiff produced a priority ducat and a memorandum signed by Warden Newland, indicating

that the service that day was from 8:00 a.m. until 1300 hours (or 1:00 p.m.).

> 24. At that point Inmate Saif'ullah became loud and disruptive in
> the presence of other inmates, disrupting Riggins, Padaoan and the
> other inmates from continuing their work. (Ex. C ¶ 12.)
>
> 25. Defendant Riggins believed Inmate Saif'ullah's outburst
> presented a danger to the security of the worksite because he could
> influence other workers to have animosity toward staff.  In
> addition, his angry demeanor caused Riggins concern that he could
> become violent. (Ex. C ¶ 13.)
>
> 28. On April 16, 1998, inmate Saif'ullah participated in a work
> slowdown with two other inmates. Defendant Padaoan believed
> that inmate Saif'ullah had influenced the other two inmates to
> refuse to work. (Ex. D ¶ 14.)
>
> 29. Based on Inmate Saif'ullah's deceptive behavior on April 1,
> 1998, his disruptive behavior on April 3, 1998, his claims that

16

1    Defendants were attempting to cause him physical injury, and his
     refusal to work on April 16, 1998, Defendants Padaoan and
2    Riggins believed inmate Saif'ullah was a negative influence in the
     clothing distribution complex. Specifically, they were concerned
3    that his presence was counterproductive to the safety, security and
     efficiency of the workplace. (Ex. D ¶ 15; Ex. C ¶ 16.)
4
     30. On April 17, 1998, Defendant Padaoan issued Saif'ullah a
5    Rules Violation Report documenting Saif'ullah's disruptive
     influence at the clothing complex, and his work slowdown.
6    (Ex. D ¶ 16.)

7         Plaintiff avers that defendants produce no evidence to substantiate the

8    representation that he disrupted work, posed a threat to security, or caused two other inmates to

9    refuse to work or a work slowdown. Opp., pp. 17-19.  Plaintiff wonders why defendants did not

10   file disciplinary actions for such alleged serious misconduct, why the actions they did file were

11   not sustained in guilty findings, why they do not in any way identify the two other inmates or

12   provide credible substantiating evidence.

13        As to Fact 30, plaintiff does not actually dispute that defendant Padaoan issued an

14   RVR on 4/17/98, but contends that the basis for it was spurious.  He submits a copy of the RVR,

15   wherein plaintiff was, on 5/2/98, once again found not guilty, the hearing officer noting that the

16   work supervisor reports plaintiff submitted showed that plaintiff's work performance was rated

17   "above average" and that Padaoan had "not shown any pattern of progressive discipline

18   regarding" plaintiff's "work performance," (as had been expressed in the RVR).  Ex. F.

19        As to defendants' facts nos. 31 and 32, plaintiff does not dispute them per se, but

20   indicates that the inference to be drawn is untrue – plaintiff avers that he was not removed from

21   his clothing distribution job for creating any sort of disturbance, that all of defendants Padaoan's

22   and Riggins' disciplinary reports were false and ultimately dismissed as unsubstantiated, and that

23   he was voluntarily unassigned from his clothing distribution job because he went out to court for

24   a federal jury trial in the Central District (Case No. 92-3216 JSL(E)).  Opp., p. 18.

25        33. At all times Defendants Padaoan and Riggins attempted to
     enforce CDCR regulations for inmate workers to the best of their
26   ability. They took the actions described above in the belief that

17

1   they were necessary and lawful. They harbored no animosity
    against inmate Saif'ullah, and acted only to effect a compromise
2   between Saif'ullah's desire to attend religious services, and[] their
    responsibility to ensure a safe and efficient workplace. (Ex. C ¶ 19;
3   Ex. D ¶ 19.)

4          Plaintiff, in his complaint, opposition and exhibits, attempts to undermine any

5   representation by defendants Padaoan and Riggins that, in preventing his attendance at the three

6   Friday Jumu'ah services in April 1998, from April 3 through April 22, 1998 (which would have

7   been 4/3/98, 4/10/98 and 4/17/98), their actions were anything other than arbitrary,

8   discriminatory, and retaliatory.

9                              *Qualified Immunity*

10          Defendants contend that they are entitled to qualified immunity.  MSJ, pp. 20-22.

11  The threshold inquiry in a qualified immunity analysis is whether a state official violated a

12  constitutional right.  Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151 (2001).  If a person

13  officially violated a constitutional right, the court conducts the following two-part inquiry to

14  determine if he or she is entitled to qualified immunity: 1) was the law governing the state

15  official's conduct clearly established; and 2) under that law could a reasonable state official have

16  believed his conduct was lawful?  Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1050 (9th

17  Cir. 2002).

18          In the first step, the court views the record in the light most favorable to the party

19  asserting injury to determine whether the officer's conduct violated a constitutional right.

20  Saucier v. Katz, 533 U.S. at 201, 121 S. Ct. at 2156.  If the plaintiff establishes the violation of a

21  constitutional right, the court next considers whether that right was clearly established at the time

22  the alleged violation occurred.  Id.  The contours of the right must have been clear enough that a

23  reasonable officer would have understood that what he was doing violated that right.  See

24  Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034 (1987).

25          The court first considers whether these defendants' conduct violated a

26  constitutional right.  In doing so, the court takes judicial notice of Mayweathers v. Terhune, CIV

18

1   S-96-1582 LKK JFM P.[7]   In Mayweathers, Judge Karlton granted the plaintiffs' motion for a

2   preliminary injunction with respect to their claim challenging Jumu'ah attendance regulations

3   imposed by CSP-Sol.   See Mayweathers Order, filed on 7/31/00, p. 6.   In doing so, the court

4   adopted Magistrate Judge Moulds' analysis of the four-factor test of Turner v. Safley, 482 U.S.

5   78, 89 (1987), for balancing prisoners' constitutional rights against legitimate correctional

6   objectives, applicable in the context of a prisoner's First Amendment right to practice his or her

7   religion.   See, O'Lone v. Estate of Shabazz, 482 U.S. 342, 349, 102 S. Ct. 2400 (1987); see also,

8   Mayweathers Finding and Recommendations, filed on 3/29/00, pp. 13-17, 37-43 (adopted by

9   Order, filed on 7/31/00).   In the 6/25/04 Order, granting the permanent injunction, Judge Karlton

10   noted that the first three (of fifteen) preliminary injunctions based on plaintiffs' claims that their

11   religious freedom was violated by prison policy regarding Jumu'ah attendance were granted

12   under the Turner standard and affirmed by the Ninth Circuit in Mayweathers v. Newland, 258

13   F.3d 930 (9th Cir. 2001).   See, Mayweathers Order, filed on 6/25/04, p. 3.   Defendants do not

14   dispute that the ruling of Mayweathers, as of the granting of the 7/31/00 preliminary injunction,

15   and the permanent injunction that ultimately ensued, on 6/25/04, clearly established that CSP-Sol

16   must permit Muslim inmates to attend Jumu'ah services during work hours without loss of credit

17   or being disciplined.   MSJ, pp. 21-22.   However, for purposes of this qualified immunity

18   analysis, "the relevant, dispositive inquiry in determining whether a right is clearly established is

19   whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he

20   confronted."   Saucier, supra, at 202, 121 S. Ct. 2151.

21            At the time of the actions by defendants Padaoan and Riggins herein at issue,

22   defendants observe that prison regulations required all inmates at CSP-Sol to participate in work

23   programs and that inmates were not to be credited with a full day of work if they missed work

24   

---

25        [7] A court may take judicial notice of court records.   See Barron v. Reich, 13 F.3d 1370,
    1377 (9th Cir. 1994); MGIC Indem. Co. v. Weisman, 803 F.2d 500, 505 (9th Cir. 1986); United
26   States v. Wilson, 631 F.2d 118, 119 (9th Cir. 1980).

1  absent approval.  MSJ, p. 21, citing CAL. CODE REGS. tit. xv, §§ 3040(c),(f) & 3043.4.[8]  Defendants

2  contend that being late or absent from work is an administrative rule violation, citing CAL. CODE

3  REGS. tit.xv, § 3315.[9]  MSJ, pp. 21-22.  Defendants maintain that they sought only to enforce

4  CDCR regulations, requiring inmates to complete a full day's work, and believed they were

5  complying with the regulations in issuing disciplinary reports for infractions.  MSJ, p. 22.  They

6  state that no clearly established law required them to release plaintiff for Jumu'ah service without

7  a ducat authorizing such release; indeed, defendants aver they were compelled, under the then-

8  established law, to require plaintiff to be present during work hours and to report unexcused

9  absences.

10         The First Amendment to the United States Constitution provides, inter alia, that

11  Congress shall make no law respecting the establishment of religion, or prohibiting the free

12  exercise thereof.  U.S. Const. amend. I.  The United States Supreme Court has held that prisoners

13  retain their First Amendment rights, including the right to the free exercise of religion.  O'Lone

14  v. Estate of Shabazz, 482 U.S. 342, 348, 107 S. Ct. 2400 (1987).  To establish a violation of the

15  free exercise clause, plaintiff must demonstrate "a substantial burden on the observation of a

16  central religious belief or practice....," Hernandez v. Commissioner of Internal Revenue, 490 U.S.

17  _____

18         [8] In their present incarnations, CAL. CODE REGS. tit.xv, § 3040(a) sets forth, in relevant part,
    that "[e]very able-bodied person committed to the custody of the Secretary of the Department of
19  Corrections and Rehabilitation is obligated to work as assigned by department staff and by
    personnel of other agencies to whom the inmate's custody and supervision may be delegated;" §
20  3040(c) sets forth the factors to be weighed considered by the classification committee in
    assigning inmates appropriate, among others, work and education programs; § 3040(f) states that
21  a staff request for removal of an inmate from a program is to be submitted to a correctional
    counselor who in turn refers the request to a classification committee for action; § 3043.2(a) sets
22  forth, inter alia, that an inmate may be denied credit for failing to perform assigned work. §
    3043.4 currently states that inmates eligible for worktime credit who, for example, refuses a full-
23  time qualifying assignment will not receive a worktime credit reduction from their sentence until
    agreeing to accept such an assignment.  See, 2007 Thomson/West (Westlaw).

24

25         [9] Notwithstanding, at least currently being "late for or absent without authorization from a
    work of program assignment" is listed as an administrative rule violation under CAL. CODE REGS.
    tit.xv, § 3314(a)(3)(H). Section 3315, cited by defendants, sets forth "Serious Rule Violations."
26  2007 Thomson/West.

680, 699, 109 S. Ct. 2136 (1989), and, in the prison context, that the regulation or policy at issue

is not 'reasonably related to legitimate penological interests.'" O'Lone v. Estate of Shabazz, 482

U.S. 342, 349, 102 S. Ct. 2400 (1987) (quoting Turner v. Safley, 482 U.S. 78, 89, 107 S. Ct.

2254, 2261 (1987)).  As compared to RLUIPA,[10] which although argued by plaintiff in his

opposition, as a statute enacted in 2000 is simply inapplicable to the state of the law in 1998, a

challenge under the free exercise clause imposes a higher standard on plaintiff and a lower

standard on defendant.

       Any challenge under the free exercise clause requires plaintiff to demonstrate that

the regulation impacts a central religious belief or practice, one that is "mandated by his faith."

Freeman v. Arparo, 125 F.3d 732, 736 (9th Cir. 1997).  Stating explicitly that "Jumu'ah is

commanded by the Koran and must be held every Friday after the sun reaches its zenith and

---

[10] Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), codified at 42 U.S.C. § 2000cc.  Section 3 of RLUIPA provides in relevant part, "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution...even if the burden results from a rule of general applicability," unless the government establishes that the burden furthers "a compelling governmental interest," and does so by "the least restrictive means."  42 U.S.C. § 2000cc-1(a)(1)-(2).  RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc(5)(7)(A).

Under RLUIPA, plaintiff bears the initial burden of going forward with evidence to demonstrate a prima facie claim that defendants' policy constitutes a substantial burden on the exercise of his religious beliefs.  Warsoldier v. Woodford,418 F.3d 989, 994 (9th Cir. 2005), citing 42 U.S.C. § 2000cc-2(b).  If plaintiff establishes the prima facie case of a substantial burden, on which he bears the burden of persuasion, defendant shall bear the burden of persuasion to prove that any substantial burden on plaintiff's exercise of his religious beliefs is both "in furtherance of a compelling governmental interest" and the "least restrictive means of furthering that compelling governmental interest."  Id., quoting 42 U.S.C. § 2000cc-1(a); § 2000cc-2(b).

"Although RLUIPA does not define what constitutes a 'substantial burden' on religious exercise, see 42 U.S.C. § 2000cc-5, in the context of a land use suit brought under RLUIPA, we have explained 'for a land use regulation to impose a "substantial burden," it must be "oppressive" to a "significantly great" extent.  That is, a "substantial burden" on "religious exercise" must impose a significantly great restriction or onus upon such exercise,' San Jose Christian Coll. v. City of Morgan Hill, 360 F. 3d 1024, 1034 (9th Cir. 2004)."  Warsoldier v. Woodford, 418 F.3d at 995. As noted, for purposes of this analysis, RLUIPA is not at issue because it was enacted in September, 2000, and is irrelevant for purposes of analyzing defendants entitlement to qualified immunity for actions taken two years before, in 1998.  See Henderson v. Terhune, 379 F.3d 709, 715 n.1 (9th Cir. 2004)(RLUIPA does not apply where plaintiff, as here, brought his Free Exercise claim only under First Amendment).

1   before the Asr, or afternoon prayer," the United States Supreme Court has made clear that it is a

2   sincerely held Muslim religious belief that Jumu'ah attendance is compelled.  O'Lone, supra, at

3   342, 345, 107 S. Ct. at 2402-03.  Thus, there is no question that Jumu'ah attendance meets the

4   "mandated by faith" requirement, and did so some eleven years before the actions at issue in this

5   complaint took place.

6           Nonetheless, the Supreme Court also has determined that when a prison regulation

7   infringes upon a prisoner's constitutional rights, it is an unconstitutional violation only if the

8   regulation is not "reasonably related to legitimate penological interests."  Turner v. Safley, 482

9   U.S. 78, 89, 107 S. Ct. 2254, 2261 (1987); O'Lone, supra, (applying Turner standard in the

10  context, as here, of a free exercise of religion claim).  The four factor Turner test is utilized to

11  determine if a prison regulation violated a prisoner's First Amendment rights.  O'Lone, 482 U.S.

12  at 349-50, 107 S. Ct. 2400.  "First, there must be a valid, rational connection between the prison

13  regulation and the legitimate governmental interest put forward to justify it, and the

14  governmental objective itself must be a legitimate and neutral one.  A second consideration is

15  whether alternative means of exercising the right on which the regulation impinges remains open

16  to prison inmates.  A third consideration is the impact accommodation of the asserted right will

17  have on guards, other inmates, and the allocation of prison resources.  Finally, the absence of

18  ready alternatives is evidence of the reasonableness of a prison regulation."  Allen v. Toombs,

19  827 F.2d 563, 567 (9th Cir. 1987) (citing Turner, 482 U.S. at 89-91); see also, Malik v. Brown

20  III, 71 F.3d 724, 728-729 (9th Cir. 1995).

21          Under the first factor of Turner, in O'Lone v. Estate of Shabazz, security of the

22  institution is a legitimate state interest.  Here, defendants contend that they were merely

23  attempting to enforce prison regulations that required inmates to be absent only with approval,

24  that an imnate must complete a full day of work to receive credit for the full day, and that, pre-

25  Mayweathers, then-existing law did not provide for an exception to attend Friday religious

26  services during work hours.  MSJ, pp. 21-22.  Unlike as in O'Lone, however, where the High

1   Court found legitimate and reasonable prison regulations precluding movement of prisoners,

2   assigned to work detail outside the prison for the day, to the inside for the Friday service, based

3   on security risks and administrative burdens, the problem here is that defendants simply do not

4   adequately make the case that their refusal to allow plaintiff attendance at Jumu'ah services for

5   three Fridays in April, 1998, was, in fact, based on their attempts to enforce a legitimate prison

6   regulation.  If it were the prison policy that were at issue, the court would be likely to find that

7   the regulations governing an inmate's absence from work and the application of work credit

8   served a legitimate state interest, particularly in light of then-existing law.  However, plaintiff has

9   raised a genuine issue of material fact as to an agreement existing between Padaoan, Riggins and

10  plaintiff (which agreement, defendants concede, that plaintiff and defendants remember

11  differently) that, so long as his work was done, he could attend Friday service without sanction of

12  any kind.  Defendant Padaoan expressly concedes that before April of 1998, plaintiff was

13  allowed to attend such services because his work was completed, although Padaoan, without

14  producing significant supporting evidence, also seeks to undermine the plaintiff's averment, prior

15  to having been cut-off, that this attendance was regular.  The fact that defendants have asserted in

16  their motion what may have been an unenforced prison regulation with respect to plaintiff, prior

17  to April 1, 1998, as a rationale for abruptly ending plaintiff's Jumu'ah attendance then does not

18  show their actions to have been in furtherance of a legitimate state interest, but rather leads to an

19  inference that the cut-off may have been, in significant part, pretextual.  Despite defendants'

20  contention that plaintiff was only denied attendance at the prayer service when plaintiff misled

21  Padaoan and left work under false pretenses (MSJ, p. 15), a contention which, as noted above,

22  plaintiff roundly disputes, the actual circumstances of the prohibition remain murky.  Plaintiff

23  has raised significant questions as to the reasons defendants put forth for the prohibition.

24          Having found that plaintiff has raised a genuine issue of material fact as to the

25  very basis for plaintiff's having been prohibited altogether from Jumu'ah attendance for the three

26  Fridays that came between 4/1/98 through 4/22/98, the court need not assess the application of

1  the other three <u>Turner</u> factors, set forth above.  Even if enforcement of the prison regulations

2  relied on by defendants may not have constituted a violation of plaintiff's constitutional right to

3  attend Jumu'ah services had they actually so relied, in light of the analysis set forth in <u>O'Lone</u>,

4  <u>supra</u>, 482 U.S. 342, 107 S. Ct. 2400, arbitrary and/or pretextual reasons for denying plaintiff

5  Jumu'ah attendance certainly would have done so based on the same decision.  The court finds

6  that the law governing when Jumu'ah attendance may be limited was clearly established at the

7  relevant time and that under that clearly established law, no reasonable officer taking action not

8  entirely predicated on an effort to implement an applicable prison regulation could have believed

9  that any such conduct was lawful.  The court cannot recommend granting defendants Padaoan

10  and Riggins qualified immunity because in this motion for summary judgment, the undersigned's

11  analysis "'must assume that the version of the facts asserted by the non-moving party is

12  correct....'"  <u>Wilkins v. City of Oakland</u>, 350 F.3d 949, 952 (9th Cir. 2003), quoting <u>Bingham v.

13  City of Manhattan Beach</u>, 341 F.3d 939, 942 (9th Cir. 2003).

14         In addition, the court finds that defendants' brief argument that missing three

15  Jumu'ah services constitutes a de minimis injury is not supported.  MSJ, p. 14.  Further, based on

16  the qualified immunity analysis, the court finds that defendants Padaoan's and Riggins' motion

17  for summary judgment on plaintiff's claim for a violation of his First Amendment right to the

18  free exercise of his religion should be denied.

19                *Retaliation*

20         Defendants argue that defendants Padaoan and Riggins did not retaliate against

21  plaintiff by issuing two disciplinary actions arising from plaintiff's missing work to attend

22  religious services.  MSJ, pp. 15-16.  Plaintiff argues that he was issued two RVR's in retaliation

23  for his having left work on a priority ducat to take part in two religious holidays (Id-ul-Ftr and Id-

24  ul-Adha).  Opp., p. 11.

25         Defendants begin their argument at the point, on April 3, 1998, when plaintiff

26  presented defendant Riggins with five administrative grievances against defendants Riggins and

1    Padaoan, as set forth in undisputed fact (UF) 20.  MSJ, p. 17.  The grievances took both

2    defendants to task for having, as of April 1, 1998, refused to allow him to attend the Friday

3    services, as well as for alleged unprofessional behavior, such as sleeping on the job, playing

4    video games at work, and sexually harassing inmates.  MSJ, p. 17.  It was explained that plaintiff

5    would have to file the staff misconduct claims directly with the Appeals Coordinator.  Id., UF 21.

6    Plaintiff raised his voice, asking if defendant Riggins was refusing to sign the grievances.  Id.,

7    UF 22.  In his complaint, plaintiff's contends that as a result of the grievances presented on April

8    3, 1998, that, on April 7, 1998, he received a 128-A custodial counseling chrono from defendant

9    Riggins, which contained fabricated statements made in retaliation for his having presented the

10   grievances.  Att. Cmp., p. 2, Ex. C.  The chrono signed by Riggins states that plaintiff was highly

11   agitated and disruptive while Riggins attempted to explain the appropriate filing procedure for

12   the 602's.  This chrono is not specifically referenced by defendants.  On April 9, 1998, plaintiff

13   presented two more 602's, alleging that defendants Riggins and Padaoan retaliated against him on

14   April 3, 1998, for filing the earlier 602's which took the form of an erroneous chrono filed against

15   him, removing him from his job assignment as clerk, and endangering his life by approaching

16   other inmates to turn them against plaintiff.  See Exs. F & G to complaint.

17         Although defendants vaguely reference two RVR's, they do not address the one

18   issued on April 7, 1998, written by defendant Padaoan, contending that plaintiff had failed to

19   report to work after a special religious celebration on that day.  They do specifically state that

20   plaintiff was felt to be a negative influence due to his claims that defendants were trying to cause

21   him physical injury, that he had behaved deceptively on April 1, 1998, been disruptive on April

22   3, 1998, and refused to work on April 16, 1998.  MSJ, pp. 17-18.  However, the evidence does

23   not adequately support their allegations because, as noted earlier, the charges set forth in the

24   RVRs written by defendant Padaoan, on April 7, 1998, or on April 17, 1998, were found to be

25   unsubstantiated at the respective hearings.  Exs. D, H, and I to complaint.

26   \\\\\

1        Inmates have a right to be free from the filing of false disciplinary charges in

2    retaliation for the exercise of constitutionally protected rights.  Pratt v. Rowland, 65 F.3d 802,

3    807 (9th Cir. 1995); Schroeder v. McDonald, 55 F.3d 454, 461 (9th Cir. 1995); Rizzo v. Dawson,

4    778 F.2d 527, 532 (9th Cir. 1985).  The Ninth Circuit treats the right to file a prison grievance as

5    a constitutionally protected First Amendment right.  Hines v. Gomez, 108 F.3d 265 (9th Cir.

6    1997); see also Hines v. Gomez, 853 F. Supp. 329 (N.D. Cal. 1994) (finding that the right to

7    utilize a prison grievance procedure is a constitutionally protected right, cited with approval in

8    Bradley v. Hall, 64 F.3d 1276, 1279 (9th Cir. 1995)); Graham v. Henderson, 89 F.3d 75 (2nd Cir.

9    1996) (retaliation for pursing a grievance violates the right to petition government for redress of

10   grievances as guaranteed by the First and Fourteenth Amendments); Jones v. Coughlin, 45 F.3d

11   677, 679-80 (2nd Cir. 1995) (right not to be subjected to false misconduct charges as retaliation

12   for filing prison grievance); Sprouse v. Babcock, 870 F.2d 450, 452 (8th Cir. 1989) (filing

13   disciplinary actionable if done in retaliation for filing inmate grievances); Franco v. Kelly, 854

14   F.2d 584, 589 (2nd Cir. 1988) ("Intentional obstruction of a prisoner's right to seek redress of

15   grievances is precisely the sort of oppression that section 1983 is intended to remedy" (alterations

16   and citation omitted)); Cale v. Johnson, 861 F.2d 943 (6th Cir. 1988) (false disciplinary filed in

17   retaliation for complaint about food actionable).

18        Within the prison context, a viable First Amendment retaliation claim "entails five

19   basic elements: (1) an assertion that a state actor took some adverse action against an inmate (2)

20   because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's

21   exercise of his First Amendment rights, and (5) the action did not reasonably advance a

22   legitimate correctional goal."  Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005).

23   However, a plaintiff need not "demonstrate a *total* chilling of his First Amendment rights to file

24   grievances and to pursue civil rights litigation in order to perfect a retaliation claim."  Id., at 568.

25   In other words, a plaintiff's allegations that "his First Amendment rights were chilled, though not

26   necessarily silenced, is enough to perfect the claim."  Id., at 569.

1    In order to state a retaliation claim, a plaintiff must plead facts which suggest that

2 retaliation for the exercise of protected conduct was the "substantial" or "motivating" factor

3 behind the defendant's conduct.  See Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th

4 Cir. 1989).  The plaintiff must also plead facts which suggest an absence of legitimate

5 correctional goals for the conduct he contends was retaliatory.  Pratt at 806 (citing Rizzo at 532).

6 Verbal harassment alone is insufficient to state a claim.  See Oltarzewski v. Ruggiero, 830 F.2d

7 136, 139 (9th Cir. 1987).  However, even threats of bodily injury are insufficient to state a claim,

8 because a mere naked threat is not the equivalent of doing the act itself.  See Gaut v. Sunn, 810

9 F.2d 923, 925 (9th Cir. 1987).  Mere conclusions of hypothetical retaliation will not suffice, a

10 prisoner must "allege specific facts showing retaliation because of the exercise of the prisoner's

11 constitutional rights."  Frazier v. Dubois, 922 F.2d 560, 562 (n. 1) (10th Cir. 1990).

12    This is not to say that a vexatious grievance filer can never be punished.

13 Vexatious litigants may be the subject of court discipline, and the undersigned would find it

14 incongruous that while the courts can punish vexatious filings, prison officials may not.  Indeed,

15 the right to petition for grievances is not absolutely protected; such a right has no greater

16 protection than speech in general.  Rendish v. City of Tacoma, 123 F.3d 1216 (9th Cir. 1997).  In

17 the prison context, one's free speech rights are more constricted from what they would be on the

18 outside.  O'Lone, supra, 482 U.S. 342, 107 S. Ct. 2400.  Again, plaintiff must show that the

19 actions or omissions constituting the "retaliation" served no legitimate penological goal.

20    While plaintiff may have abused the grievance process by submitting no less than

21 five grievances, in his first set of appeals, which were apparently rejected by the Appeals

22 Coordinator, as presented in his own exhibits, Ex. B, p. 6, to Cmp., defendants' reliance on

23 defendant Padaoan's claim that plaintiff did not have authorization to take part in a Muslim

24 religious holiday beyond 9:30 a.m. on April 7, 1998, was repudiated in the findings based on the

25 evidence presented at the hearing on that charge.  That plaintiff's claims of threatened injury at

26 the hands of defendants Padaoan and Riggins, in the second set of grievances, may have been

27

1    histrionic, do not constitute a basis for filing a disciplinary charge of poor work performance or

2    disruptive behavior that was not substantiated at the hearing.  Just as significant questions are

3    raised with respect to plaintiff's claims of violations of his right to practice his religion, so his

4    allegations of retaliation by Padaoan and Riggins, also in violation of the First Amendment, are

5    not put to rest by defendants' motion.  Defendants themselves acknowledge that attending

6    religious services and filing grievances "are undoubtedly protected conduct under the First

7    Amendment."  Opp., p. 18.

8          Defendants have not demonstrated that the disciplinary action taken, either in the

9    form of prohibiting plaintiff's attendance at the prayer services or in the form of filing

10   unsubstantiated rules violation reports, did not have retaliation as the "substantial" or

11   "motivating" factor behind their conduct.  Soranno's Gasco, Inc. v. Morgan, supra, 874 F.2d at

12   1314.  Plaintiff has raised a genuine issue of material fact as far as the requisite suggestion of an

13   absence of legitimate correctional goals for the conduct he contends was retaliatory.  Pratt v.

14   Rowland, supra, 65 F.3d at 806.  In having been deprived of his right to attend the services and

15   having been subjected to unsubstantiated disciplinary charges, plaintiff has adequately shown

16   that his First Amendment rights were chilled by their putatively disciplinary conduct.  Rhodes v.

17   Robinson, 408 F.3d at 569.

18          Nor does the court find that defendants' argument for qualified immunity as to the

19   claims of retaliation is well-founded.  As noted, defendants themselves expressly concede that an

20   inmate's right to attend religious services and to file grievances "are undoubtedly protected

21   conduct under the First Amendment."  That this "undoubtedly protected conduct" was clearly

22   established law at the time of these defendants' actions is not seriously challenged; nor is there

23   an adequate demonstration that these defendants, as reasonable state officials, would not have

24   known that such alleged disciplinary measures as were taken, in light of the doubts raised as to

25   their legitimacy, were unlawful.  Defendants' motion for summary judgment as to plaintiff's

26   retaliation claims against defendants Padaoan and Riggins, and for qualified immunity as to those

28

1   claims, should be denied.

2       *Defendant Montano*

3       Defendant Montano couches plaintiff's complaint as to him as a violation of

4   plaintiff's First Amendment right to practice religion and his Fourteenth Amendment right to

5   equal protection by not permitting plaintiff to enter the dayroom early to conduct a religious

6   prayer.  MSJ, p. 5.  Defendant Montano moves for summary judgment on the grounds that he did

7   not violate those rights and in any event is entitled to qualified immunity.  MSJ, pp. 8-12, 20-23.

8       *Undisputed Facts*

9       34. Defendant Montano is a Correctional Officer, at CSP-Solano.
(Ex. B, Montano Decl., ¶ 1.)

10

11       35. On June 10, 1998, at approximately 4:00 a.m., while on duty in
Building 15 at CSP-Sol, Defendant Montano observed inmate
Khalifah Saif'ullah, along with approximately 6-8 other inmates

12   enter the day room. They walked to the southern part of the day
room next to the A and B Dorms, with prayer matts and attempted

13   to begin prayers. (Ex. B ¶ 3.)

14       36. The day room is an open area in front of the dorms. The day
room consists of approximately 4,500 square feet of open space.

15   The inmates can use the day room any time between the hours of
5:30 a.m. to 9: 45 p.m. to congregate, conduct meetings, read, eat,

16   talk, pray, study watch television or participate in group programs.
The day rooms has tables, chairs, a television area with benches

17   and phones. (Ex. B ¶ 4.)

18       37. The inmates can enter the day room on first watch only to go to
and from the restroom and use the water fountain. Any other

19   activities are not authorized on first watch due to the limited
number of officers on first watch. There are only 2 officers to

20   supervise 300 or more inmates in each open dorm setting. (Ex. B ¶
5.)

21

22       38. There are 22 dorms in the building on two tiers. The Dorms are
open dorm setting. Each dorm has between 12-16 inmates. There
are no doors or locks in the dorms. (Ex. B ¶ 6.)

23

24       39. Inmate Saif'ullah was attempting to enter the dayroom before it
was open, and Defendant Montano informed him he could not use
the dayroom yet. (Ex. B ¶ 7.)

25

26       40. In response, inmate Saif'ullah informed Montano that he
wanted to enter the dayroom to conduct a group prayer and that

Montano was violating his constitutional rights by preventing him from doing so. He provided Montano with a memorandum from Mr. Valdez stating that the institution should enable the inmates to pray together when feasible, but that "the Muslim inmates do not need to attend a place of worship to complete these prayers." (Ex. B ¶ 8.)

41. Because the institutional policy prevented opening the dayroom before 5:30 a.m., Defendant Montano instructed inmate Saif'ullah and the other inmates that they may pray next to their assigned bunks, but he could not open the day room early. (Ex. B ¶ 9.)

42. Defendant Montano informed his supervisor immediately after the incident and was informed that there will be no program changes unless directed by the Warden, and that Montano should not open the day room earlier than 5:30 a.m. (Ex. B ¶ 10.)

43. At all times Defendant Montano attempted to enforce CDCR regulations regarding the program rules for the day room to the best of his ability. He took the actions described in the declaration with the belief that they were necessary and lawful. He harbored no animosity or ill will against inmate Saif'ullah. (Ex. B ¶11.)

### *At Issue*

In his complaint, as set forth earlier, plaintiff contends that defendant Montano did not permit plaintiff and other Muslims to congregate for a dawn prayer to be performed between 4:00 a.m. and 4:45 a.m., despite an authorizing memorandum plaintiff presented to him, Montano stating that he did not care whether plaintiff's practice of religion was thereby being infringed, asserting that no congregational prayer would take place on the dayroom floor before 5:30 a.m.  Att. Cmp., pp. 4,8, Ex. J.  In his opposition (Opp., pp. 5-6), plaintiff reiterates this claim.  Exhibit D to his opposition includes a copy of a memorandum (from which defendant has quoted in UF # 40), dated June 6, 1997, directed to several associate wardens with respect to "Muslim Daily Prayers," and signed by M. Valdez, Community Resources Manager.  The memorandum states (to the extent the copy is legible):

The Muslim religion has a requirement for five daily prayers, i.e., Salaatus Subh, Salaatuz Zuhr, Salaatul Asr, Salaatul Maghrib and Salatul Aishaa (see attachment).  The prayers are an obligatory ordinance of worship and have a time element attached to them which outlines the time each prayer is to be completed.  The

30

1         Muslim inmates do not need to attend a place of worship to
      complete these prayers, however, the prayer ritual does have a need
2         for the inmate to stand, bend and kneel in a stationary location.

3   Ex. D to Opp. (Ex. J to Complaint).

4         Attached to plaintiff's copy of the memo is what appears to be a June 1, 1997,

5   memo to a Captain Brumfield at CSP-Solano, from a Lieutenant Milano, with an unidentifiable

6   signature, requesting (not authorizing) that CSP-Solano prisoners, from Level Two, Facilities 3

7   and 4, be allowed to conduct their "fajr/morning salat (i.e. prayer)" between 4:00 a.m. and 4:45

8   a.m.  The unauthenticated memo states that Muslims must pray five times a day, with prayer time

9   varying during daylight savings time.

10         The problem for plaintiff here is that, despite the Valdez memo, which both

11   parties cite, there is too little evidence that the "authorizing memo" (or the attachments) did

12   constitute a mandatory direction to defendant Montano, sufficient to overcome the security

13   concerns that he asserts, and plaintiff does not adequately dispute any of the facts set forth by

14   defendant, despite Montano's alleged uncaring attitude in refusing plaintiff admittance to the

15   dayroom early.

16         *Qualified Immunity*

17         As set forth above, for purposes of evaluating whether the defendant is entitled to

18   qualified immunity, the law that is applicable is the law that was clearly established at the time of

19   the official's actions.  "The contours of the right must be sufficiently clear that a reasonable

20   official would understand that what he is doing violates that right."  Saucier v. Katz, supra, 533

21   U.S. at 202, 121 S. Ct. 2151. "The relevant, dispositive inquiry in determining whether a right is

22   clearly established is whether it would be clear to a reasonable office that his conduct was

23   unlawful in the situation he confronted."  Id.  If a person officially violated a constitutional right,

24   the court conducts the following two-part inquiry to determine if he or she is entitled to qualified

25   immunity:  1) was the law governing the state official's conduct clearly established; and 2) under

26   that law could a reasonable state official have believed his conduct was lawful?  Estate of Ford v.

1    Ramirez-Palmer, supra, 301 F.3d at 1050 (9th Cir. 2002).

2           In the first step, the court views the record in the light most favorable to the party

3    asserting injury to determine whether the officer's conduct violated a constitutional right.

4    Saucier v. Katz, 533 U.S. at 201, 121 S. Ct. at 2156.  Assuming that, applying Mayweathers

5    more broadly, not in the context of a denial of the right to attend Jumu'ah service but, with

6    regard to this defendant, preventing plaintiff from entering the dayroom at a pre-dawn hour to

7    conduct one of the five requisite daily Muslim prayers, that plaintiff has established the violation

8    of a constitutional right, the court next considers whether that right was clearly established at the

9    time the alleged violation occurred.  Id.  The contours of the right must have been clear enough

10   that a reasonable officer would have understood that what he was doing violated that right.  See

11   Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034 (1987).

12          In this case, as previously stated herein, the clearly established law with respect to

13   a free exercise claim in the prison context at the time of defendant Montano's action of which

14   plaintiff complains was set forth in O'Lone v. Estate of Shabazz, supra, 482 U.S. at 348-349, 102

15   S. Ct. 2400.  Affirming that all constitutional rights are not forfeited by reason of an individual's

16   conviction and incarceration, the High Court nevertheless recognized that "[t]he limitations on

17   the exercise of constitutional rights arise both from the fact of incarceration and from valid

18   penological objectives, including deterrence of crime, rehabilitation of prisoners, and

19   institutional security."  Id., at 348, 102 S. Ct. 2400.  The proper standard to be applied to a prison

20   regulation alleged to infringe on constitutional rights was restated in Turner v. Safley, supra, 482

21   U.S. at 89, 107 S. Ct. at 2261: "[W]hen a prison regulation impinges on inmates' constitutional

22   rights, the regulation is valid if it is reasonably related to legitimate penological interests."

23   O'Lone, supra, 482 U.S. at 349, 107 S. Ct. 2400, quoting Turner, supra, at 89, 107 S. Ct. 2261.

24          In O'Lone, supra, 482 U.S. 342, 344, 107 S. Ct. 2400, the High Court held that

25   two prison policies which prevented Muslims inmates assigned to outside work from attending

26   Jumu'ah services did not violate their rights under the First Amendment's Free Exercise Clause,

32

1 applying the balancing of the four-factor Turner test, which has been previously set forth.

2        Defendant Montano acknowledges that he did refuse plaintiff permission to enter

3 the dayroom before 5:30 a.m., but contends that his action in doing so was required to preserve

4 institutional security.  Plaintiff argues that, under RLUIPA, all defendants have violated his right

5 to practice his religion.  However, as noted, the applicable law in this qualified immunity analysis

6 pre-dates RLUIPA and, pursuant to Henderson v. Terhune, 379 F.3d 709, 715 n.1 (9th Cir. 2004),

7 RLUIPA does not apply where plaintiff, as here, brought his Free Exercise claim only pursuant to

8 the First Amendment.[11]

9        Plaintiff does not dispute defendant Montano's declaration as to there being only

10 2 officers to supervise 300 or more inmates in each open dorm setting; that inmates can enter the

11 dayroom on first watch only to go to and from the restroom and use the water fountain; that there

12 are no doors or locks in the dorms; that plaintiff was attempting to enter the dayroom before it

13 was open; that the Valdez memo stated that "the Muslim inmates do not need to attend a place of

14 worship to complete these prayers;" that the institutional policy prevented opening the dayroom

15 before 5:30 a.m.; that defendant Montano instructed plaintiff and the other inmates that they may

16 pray next to their assigned bunks, but he could not open the dayroom early; that Montano

17 informed his supervisor immediately after the incident and was informed that there were to be no

18 program changes unless directed by the warden, and that Montano should not open the dayroom

19 earlier than 5:30 a.m; that Montano attempted to enforce CDCR regulations regarding the

20 program rules for the dayroom to the best of his ability.  UF nos. 37-43.

21        Under O'Lone, supra, at 350-351, 107 S. Ct. 2400, the Supreme Court found that

22 the prison policies therein challenged satisfied the first Turner factor, requiring a regulation to

23 have a logical connection to legitimate government interests, where certain prisoners were

24 required to work outside the facility and prohibiting their return to the prison during the day due

25

26        [11] Moreover, at least one court found that the RLUIPA statute does not permit a claim for
damages.  Bole v. Neet, 402 F. Supp.2d 1237, 1241 (D. Colo. 2005).

1   to overcrowding, drain on facility, tension, congestion and rehabilitation concerns.  Similarly,

2   here defendant Montano credibly argues that use of the CSP-Sol dayroom must limit inmate use

3   for security purposes to the hours of 5:30 a.m. to 9:45 p.m., when prior to 5:30 a.m., there are

4   only 2 officers to supervise 300 inmates in each open dorm setting, thus, signifying that the

5   number of officers available for supervision of the dayroom before 5:30 a.m. is too limited.  To

6   permit plaintiff to enter early risked other inmates seeking to do so, creating a further security

7   risk.  MSJ., p. 10.

8           In O'Lone, at 351-352, 107 S. Ct. 2400, the High Court found that the second

9   Turner factor, that alternative means of exercising their right to practice their religion remained

10  open to inmates, militated for defendants, finding that the inmates were able to participate in

11  other Muslim ceremonies, such as congregating for prayer outside of work hours, having meals

12  without pork, special arrangements for Ramadan, even though it was acknowledged that there

13  was "of course, no alternative means of attending Jumu'ah."   Here, defendant Montano contends

14  that he did not prohibit plaintiff from participating in the early prayer service, only refused access

15  to the dayroom for such purpose before 5:30 a.m.  MSJ., pp. 10-11.  Moreover, the court

16  observes that the Valdez memo states that "the prayer ritual does have a need for the inmate to

17  stand, bend and kneel in a stationary location" but does not state that it must take place in the

18  dayroom.  As to the third and fourth factors, consideration of the impact of accommodation of

19  the asserted right on other inmates, prison personnel and the allocation of prison resources, and

20  absence of ready alternatives, the Supreme Court found that the extra supervision that would be

21  required for any of the suggested alternatives would drain limited resources and that special

22  accommodations for one group would lead to a perception of favoritism by others.  O'Lone,

23  supra, at 352-353, 107 S. Ct. 2400.  Similarly, defendant Montano maintains that changing the

24  prison policy would have had an unreasonable impact on the institution, due to requiring staffing

25  changes, and that no reasonable alternatives have been offered.  Even assuming that plaintiff's

26  version of the facts is correct, Wilkins v. City of Oakland, supra, 350 F.3d at 952, plaintiff's

34

1  reliance on a memorandum that in no way expressly purports to override existing prison policy is

2  simply not sufficient.

3          Thus, the court finds that even if, after Mayweathers, it must be concluded that

4  plaintiff's right to practice his religion was infringed by defendant Montano's refusal to open the

5  dayroom to accommodate plaintiff, in light of O'Lone, supra, Montano, as a reasonable state

6  official could have believed his conduct in abiding by the prison's policy with respect to dayroom

7  hours was reasonable.  The court finds that defendant Montano is entitled to qualified immunity

8  for any alleged infringement of plaintiff's First Amendment rights.

9                      *Fourteenth Amendment*

10         As to any purported Fourteenth Amendment equal protection claim alleging

11 discrimination based on his religion, which plaintiff does not significantly address in his

12 opposition, summary judgment is proper where there is a lack of evidence to support the claim.

13 Safouanne v. Fleck, 226 Fed. Appx. 753, 764 (9th Cir. March 2007)(unpub).[12]   "To state a claim

14 under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause of the Fourteenth

15 Amendment a plaintiff must show that the defendants acted with an intent or purpose to

16 discriminate against the plaintiff based on membership in a protected class."  Lee v. City of Los

17 Angeles, 250 F.3d 668, 686 (9th Cir. 2001).  As defendant Montano contends, the undisputed

18 evidence shows that Montano treated plaintiff as any other inmate would be treated, none of

19 whom were permitted to congregate in the dayroom before 5:30 a.m.  Opp., .p. 11.

20         Defendants' motion for summary judgment as to defendant Montano should be

21 granted.

22 \\\\\

23 \\\\\

24 \\\\\

25

26       [12] While not cited as binding precedent, the decision is indicative of a Ninth Circuit
   panel's position.

*Defendants Hasan and Shah*

*Undisputed Facts*

46. E. Shah is an Imam in the faith of Islam. An Imam is a religious leader who leads prayers and provides religious guidance to members of the Islamic community. In order to become an Imam Shah has taken Islamic classes at Bilal Islamic Center in Los Angeles, and has studied the Qu'ran with Imam Hasan. He has taken courses in Islamic history, the Holy Qu'ran, and Principles of faith, among other topics. (Ex. E, Shah Decl. ¶ 1.)

47. A. Hasan is an Imam in the faith of Islam. He has taken Islamic classes for the last thirty years, and has studied the Qu'ran in ten different countries. He has studied with Imam W. Deen Mohammed, among others. He has taken courses in Islamic history, the Holy Qu'ran, the rules and regulations of Islam and the traditions of Sunnah of the Prophet Mohammed. (Ex. A, Hasan Decl. ¶ 1.)

48. During 1998, Shah volunteered his time as a member of the Chaplain's Coordinating Committee at CSP-Solano, where he met with other religious staff members of the CDCR on a quarterly basis to discuss issues of religion and how to facilitate the practice of religion inside the prisons. They shared their observations with the Director and other CDCR staff. (Ex. E ¶¶ 2, 3.)

49. As a volunteer at CSP-Solano, Shah's duties included interviewing and counseling inmates on ethical and moral problems and spiritual matters, and presiding at Jumah services, Ramadan, Ta'leem classes and other Islamic days of religious observance. He also performed community outreach programs outside the institution. (Ex. E ¶ 4.)

50. Hasan has functioned as an advisor to the Department of Corrections and Rehabilitation from 1974 to the present. He has been a member of the California State Advisory Committee on Institutional Religion. In this role, he attempts to clarify for institution officials what is required to adequately practice the rituals of prayer for the religion of Islam, and to distinguish between what is required and what is merely desirable. (Ex. A ¶ 2.)

51. At all times Defendants Hasan and Shah acted to assist the inmates in all of California's State Prisons and not to harm them. Their actions were intended to facilitate the Muslim inmates' religious faith, not to hinder it. They worked to strengthen the inmates' spiritual awareness and practice of the religion of Islam. (Ex. A ¶ 3; Ex. E ¶ 5.)

52. Defendants Hasan and Shah understand that reasonable people can disagree on the proper interpretation of Islamic texts and

36

tenets, however, they have always interpreted Islamic texts
sincerely, as they believe the writers intended the texts to be
understood. They have never interpreted religious texts or
recommended religious practices with the intent to harm anyone.
Their intentions have always been to promote spiritual and
religious growth within the religion of Islam. (Ex. A ¶ 4; Ex. E ¶
6.)

### *Discussion*

Defendants contend that defendants Hasan and Shah are entitled to summary

judgment because plaintiff has simply alleged a difference of opinion with respect to their

interpretation of religious texts; that defendants have interpreted the Islamic texts sincerely; that

they have a right to follow the dictates of their own conscience in interpreting their faith and

cannot be subject to liability on the basis that plaintiff disagrees with their religious

interpretations.  MSJ, p. 20.

Under CAL. CODE REGS. tit.xv, § 3045.2(d)(4), inmates are permitted excused time

off for, inter alia, "special religious functions, other than routine services."  Plaintiff contends

that the allegedly erroneous advice of defendants Hasan and Shah that attendance at Jumu'ah was

not mandatory for Muslims in prison led to the CDCR's classification of the Friday Jumu'ah

service as a routine service for which excused time off was exempted.  Opp., p. 9.  Defendants

have never attempted to correct this alleged misinformation, which led to plaintiff, who was

committed to CDCR in 1980, to being deprived of his constitutional right to attend Jumu'ah

service from 1980 until the Mayweathers permanent injunction issued.  Opp., p. 9.[13]  Other

information supplied by defendants Shah and Hasan with which plaintiff takes issue include the

manner in which meat provided by the CDCR can be made appropriate for a Muslim and that

there are no requisite religious artifacts in Islam.  Opp., pp. 10-11.  Plaintiff attempts to dispute

UF no. 52, contending that defendants' representation that plaintiff and these defendants simply

---

[13] The court observes, however, that plaintiff himself states earlier on the same page that
he did not become a practicing Muslim until 1987.  Opp., p. 9.  Thus, it appears that for seven
years after plaintiff was incarcerated (1980 to 1987), any advice by these defendants re: what was
or was not mandatory in the practice of Islam could not have significantly impacted him.

1   have a difference of opinion is not accurate; that Islam (or al-Islam) does not admit of error or

2   misinterpretation as to ritual and custom but is a matter of Qu'ranic command; and that

3   defendants Hasan and Shah have been admonished and advised of appropriate Islamic practice by

4   plaintiff's spiritual advisor, Sheikh Muhammad Shareef.  Opp., p. 11, Ex. A.[14]

5            It is not the province of this court to weigh defendants' Hasan's and Shah's

6   interpretation of Islamic texts and tenets against those of plaintiff or his spiritual advisor, Sheikh

7   Shareef.  "[R]eligious controversies are not the proper subject of civil court inquiry...." Serbian

8   Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696, 713, 96 S. Ct. 2372 (1976).

9                Some religious interests under the Free Exercise Clause are so
             strong that no compelling state interest justifies government
10            intrusion into the ecclesiastical sphere.  A secular court may not,
             for example, adjudicate matters that necessarily require it to decide
11            among competing interpretations of church doctrine, or other
             matters of an essentially ecclesiastical nature...."

12

13   Bollard v. California Province of the Society of Jesus, 196 F.3d 940 (9th Cir. 1999).

14            Nor is the court's conclusion with respect to these defendants inconsistent with

15   O'Lone.  In that case the Supreme Court noted that attendance at Jumu'ah was mandatory in the

16   context of finding that the inmates' religious beliefs were sincerely held.  Id. 482 U.S. at 345, 107

17   S.Ct. At 2402.  The Supreme Court simply cited to the "Koran" and the record before it for that

18   purpose.  It is completely unclear whether the record on that issue was contested at all, of if so,

19   how much.  The Supreme Court was, without a doubt, *not* settling a dispute over religious

20   doctrine for which application of judicial notice or collateral estoppel is appropriate.  While the

21   observation by the Supreme Court in the context in which it was made would have put secular

22   prison officials on notice of the bona fides of plaintiff's beliefs in this case, and the need for

23

24        [14] Plaintiff's Ex. A appears to be a copy of a lengthy letter, dated February 8, 1998, signed
     by Muhammad Shareef, Director of the Santore Institute of Islamic-African Studies, and
25   addressed to defendant Shah, strongly reproaching him, inter alia, for a perceived lack of
     scholarship with regard to the practice of Islam and an alleged hypocritical and cavalier approach
26   to the tenets and text of Islam in his (Shah's) advisory letter to the CDCR.

1  religious accommodation, the religious doctrine issue in question here is whether attendance was

2  mandatory *for prison inmates*.  The fact that a trained Imam here disagreed with the Imam in

3  O'Lone gives no basis for finding a violation of the Constitution for "negligent religious advice."

4  Defendants' motion for summary judgment as to defendants Hasan and Shah should be granted.

5            Accordingly, IT IS HEREBY RECOMMENDED that:

6            1. Defendants' October 12, 2006, motion to dismiss be denied;

7            2. Defendants' motion for summary judgment, filed on October 12, 2006, be

8  denied as to defendants Padaoan and Riggins on the First Amendment free exercise and

9  retaliation claims, and summary judgment be granted as to defendants Montano, Hasan and Shah;

10           3.  Upon adoption of these findings and recommendations, should that occur, this

11 case proceed to trial against defendants Padaoan and Riggins.

12           These findings and recommendations are submitted to the United States District

13 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

14 days after being served with these findings and recommendations, any party may file written

15 objections with the court and serve a copy on all parties.  Such a document should be captioned

16 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

17 shall be served and filed within ten days after service of the objections.  The parties are advised

18 that failure to file objections within the specified time may waive the right to appeal the District

19 Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

20 DATED: 8/24/07

21                              /s/ Gregory G. Hollows

22                              GREGORY G. HOLLOWS
                             UNITED STATES MAGISTRATE JUDGE

23 GGH:009
   saif1322.msj

24

25

26